IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>AU OPTRONICS CORP., et al.,<br><br>    Defendants.<br>_____/ | No. C 09-00110 SI<br><br>**ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS** |

On May 20, 2011, the Court heard argument on a motion to suppress filed by defendants AU Optronics Corporation ("AUO") and AU Optronics Corporation America ("AUO America"). These defendants sought to suppress all evidence recovered in a December 7, 2006, search of AUO America's Houston, Texas, office. Having considered the arguments of counsel and the papers submitted, the Court DENIES defendants' motion.

## BACKGROUND

In June 2010, AU Optronics Corporation ("AUO") and its wholly-owned subsidiary, AU Optronics Corporation America ("AUO America"), were indicted on charges of price-fixing in violation of the Sherman Act, 15 U.S.C. § 1. AUO is major producer of thin-film transistor liquid crystal display ("TFT-LCD") panels, electronic components that are used in computer monitors, televisions, and other consumer electronics. Superseding Indictment, ¶¶ 3-4. The Superseding Indictment alleged that AUO, along with other TFT-LCD manufacturers, had conspired to fix worldwide prices of TFT-LCD panels.

The investigation into AUO's price fixing began in early 2006. By December 2006, the government had gathered enough evidence to apply for a warrant to search the offices of AUO America.

*See* Declaration of Michael L. Scott in Support of United States' Opposition to Motion to Suppress ("Scott Decl."), Exh. A. The search warrant application was supported by a lengthy affidavit from FBI Special Agent Susan Sivok. *See* Scott Decl., Exh. A ("Sivok Aff."). The bulk of this affidavit was devoted to a detailed description of the price-fixing conspiracy, obtained from interviews with four confidential witnesses – all former employees of another TFT-LCD manufacturer – as well as from a review of documents the government had obtained in the course of its investigation.

Sivok's affidavit described in detail so-called "Crystal Meetings" that occurred on a monthly basis in Taiwan between 2001 and 2006. According to the affidavit, a "typical" meeting would proceed as follows:

> Representatives of each of the six LCD panel suppliers present . . . would first discuss the current worldwide supply and demand for LCD panels. Each supplier would then provide the group its current monthly production volumes and its projected production volumes for the next month. They would often discuss any significant increases in reported current or projected production or capacity by one of the suppliers.
>
> [A]fter the suppliers discussed supply and demand and production volumes, they would then discuss LCD panel prices. The discussions concerned prices for LCD panels sold worldwide, including LCD panels sold to United States customers. Typically, at each Crystal Meeting, a representative from each supplier would provide that supplier's *current* price for a variety of standard panel sizes and applications. These prices were listed next to their corresponding panel sizes on charts displayed on a screen at the meeting. Each supplier would then state its *projected* prices for each panel size for the next month. According to [a confidential witness], the suppliers would then reach a "common consensus" on pricing for each panel size for the next month. If a supplier reported any current price lower than the "consensus" price, that supplier would be asked to justify the low price to the other participants.

Sivok Aff., ¶¶ 28-29.

In addition to this general description, the affidavit quoted from documents that detailed the participants in, and content of, the discussions at specific meetings. For example, one document summarizing a February 8, 2002, Crystal Meeting stated, "According to [Chi Mei], it increased price by $20 for [Hewlett-Packard] in March ($450 > $470) but [Hewlett-Packard] did not object. Price for Sony was $430 in February but plans to increase price to $450 and requested [LG PHILIPS] cooperation." Sivok Aff., ¶33. Other documents reflected the consensus decisions made on prices of LCD panels. *See*, *e.g.*, Sivok Aff., ¶ 36 (report dated March 31, 2005, stating that "because increasing production for [monitor] panels would be difficult at least during the near future, the LCD Vendors are all, without exception, increasing price of 17" by $3 to $5, reaching the level of $160").

2

The affidavit also described what were known as "CEO Meetings," which were held in Taiwan between higher-level officials of the TFT-LCD manufacturers. CEO meetings occurred three to four times between 2001 and 2005 and "were intended to be discussions by the lead decision-makers at each company." Sivok Aff., ¶¶ 37-38. They commonly included a discussion of "LCD panel supply worldwide and the need to reduce production volumes." *Id.* According to the affidavit, representatives of AUO regularly attended both the Crystal and CEO meetings. Sivok Aff., ¶ 40.

Finally, in addition to these formal meetings, all of which were held in Taiwan, the affidavit also described collusive activity that occurred on a less formal basis. For example, the affidavit stated that one of the government's confidential witnesses "had one-on-one meetings with AU OPTRONICS' Executive Vice President, Hui Hsiung," and that he met with AUO representatives approximately two to three times a year. Sivok Aff., ¶42. Another government witness "had discussions about pricing to Dell with Michael Wong, the AU OPTRONICS manager for the Dell account, who was stationed in San Jose, California . . . ." Sivok Aff., ¶44.

Based on this evidence that AUO had participated in a price-fixing conspiracy, the search warrant application sought to search the Houston office of AUO America for evidence of a Sherman Act violation. The affidavit did not, however, identify the corporate distinction between AUO and AUO America. Instead, it stated that the Houston offices belonged to AUO. *See*, *e.g.*, Sivok Aff., ¶8 ("I make this affidavit in support of an application for a search warrant for the business offices . . . of AU OPTRONICS, which is located at 9720 Cypresswood Drive, Suite 241, Houston, Texas 77070 . . . ."), ¶10 ("AU OPTRONICS is headquartered in Hsinchu, Taiwan, and has sales offices in . . . the United States (Houston, Texas; Cupertino, California; and Chicago, Illinois)."

The affidavit indicated that evidence of the conspiracy was likely to be found in the Houston office because that office was responsible for LCD-panel sales in the United States, including sales to Hewlett-Packard, a major purchaser of TFT-LCD panels. *See*, *e.g.*, Sivok Aff., ¶10 ("Procurement personnel for Hewlett-Packard negotiated pricing with AU OPTRONICS personnel located at AU OPTRONICS' offices in Houston, Texas."), ¶33 (notes of a Crystal Meeting that indicate discussions about the price of LCD panels sold to Hewlett-Packard). Thus, the affidavit sought documents related to pricing and sales of LCD panels from the Houston office. In addition, based on the government

3

1 witnesses' statements that collusive activity occurred between members of sales staff located abroad, 2 the search warrant sought evidence of communications or meetings between AUO personnel and 3 employees of other LCD manufacturers.[1]

4 The search warrant application was ultimately presented to Magistrate Judge Frances Stacy in 5 Houston, and was approved. On December 7, 2006, the search was conducted, with agents seizing 6 images of computer hard drives, documents, and personal property belonging to AUO America and its 7 employees. Defendants AUO and AUO America now move to suppress the evidence recovered in the 8 search, claiming that the search warrant was not supported by probable cause and that the warrant 9 affidavit contained numerous material misrepresentations.[2]

## LEGAL STANDARD

Under the Fourth Amendment, a search warrant may not issue without probable cause. U.S. Const. amend. IV. The determination whether probable cause exists is a "practical, common-sense decision" made in light of the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."). In determining whether a search warrant was based upon probable cause, the district court, is "limited to the information and circumstances contained within the four corners of the underlying affidavit." *United States v. Stanert*, 762 F.2d 775, 778, amended on other grounds, 769 F.2d 1410 (9th Cir. 1985).

Review of a magistrate judge's determination that probable cause existed for a warrant is

---

[1] Specifically, the search warrant application sought: 1) communications between employees of AUO and "any employee or agent of any other LCD panel supplier"; 2) documents relating to LCD panel pricing; 3) documents used to prepare bids or quotes submitted to prospective purchasers of LCD panels; 4) appointment records of management or sales employees of AUO; 5) travel vouchers of management or sales employees or AUO; 6) telephone records of management and sales employees of AUO; 7) address books; 8) accounting records. Sivok Aff., Attach. B.

[2] Three of the individual defendants filed motions joining in the motion to suppress. After the government pointed out that none of them has standing to challenge the search, they have all withdrawn their joinders.

4

deferential; "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 238-39; *see also United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) ("Normally, we do not 'flyspeck' the affidavit supporting a search warrant through de novo review; rather, the magistrate judge's determination should be paid great deference." (internal quotation marks omitted)).

When a search warrant was based upon probable cause, a defendant can challenge the warrant on the ground that it contains material misstatements. *See Franks v. Delaware*, 438 U.S. 154 (1978). "A defendant is entitled to a [*Franks*] hearing if he makes a substantial preliminary showing that a false statement was deliberately or recklessly included in an affidavit submitted in support of a wiretap order, and the false statement was material to the district court's finding of necessity." *United States v. Staves*, 383 F.3d 977, 982 (9th Cir. 2004).

**DISCUSSION**

Defendants argue, first, that the search warrant was not supported by probable cause. If the Court finds probable cause, the defendants argue that a *Franks* hearing is warranted to determine whether the warrant affidavit included material misstatements. The Court rejects both claims.

**I.    Probable cause**

Defendants claim that the warrant lacked probable cause because the supporting affidavit did not contain any "factual assertions . . . which link[ed] the purported illegal conduct in Taiwan and Korea to the Houston office." Motion at 11. Defendants point out that virtually all the price-fixing allegations made in the affidavit, such as the content of the Crystal Meetings or CEO Meetings, described conduct that occurred in Taiwan. Of the few allegations contained in the affidavit of price-fixing conduct that occurred in the United States, none makes any reference to the Houston office. Thus, according to defendants, the affidavit did not provide any grounds to believe that the Houston office would contain evidence of the price-fixing conspiracy.

The Court disagrees. Although the defendants' price-fixing conduct may have occurred primarily outside of the United States, the affidavit established far more than a "fair probability" that

5

evidence of that conduct would be located in the Houston office.

To begin with, the affidavit easily established a "fair probability" that sales records and pricing information would be located in the Houston office. *See* Sivok Aff., Attach. B at ¶¶ a.B, a.C (stating that search would cover "documentation relating to any LCD panel pricing" and "documents used to prepare bids or quotes submitted to prospective purchasers of LCD panels"). These records would undoubtedly constitute evidence that could be used to establish that price-fixing occurred. *See United States v. Barnett*, 667 F.2d 835, 843 (stating that search may lawfully include "relevant evidence in aiding the government in [its] prosecution"); *United States v. Rubio*, 727 F.2d 786, 793 ("[A]ny evidence relevant to prove any element of the . . . offense is potentially seizable . . . ."). The records could be used to establish that AUO adhered to the pricing decisions reached at the Crystal Meetings. They would also be relevant to show that there was a sufficient nexus between the price-fixing conspiracy and the United States for the United States to exercise its criminal jurisdiction. Indeed, defendants already moved to dismiss the indictment on the ground that there was not sufficient evidence that the conspiracy was directed at the United States.

Price and sales records were likely to be found in the Houston office because that office was the sales office that handled negotiations with Hewlett-Packard, a major purchaser of LCD panels. Sivok Aff., ¶13 (stating that Hewlett-Packard purchases approximately $3.5 billion in LCD panels annually, and that one of its largest suppliers is AU Optronics), ¶16 ("Procurement personnel for Hewlett-Packard negotiated pricing with AU OPTRONICS personnel located at AU OPTRONICS' offices in Houston, Texas."), ¶47 (""Representatives from Hewlett-Packard have also identified the 9720 Cypresswood Drive address as AU OPTRONICS' sales office."), ¶47 ("[Hewlett-Packard] representatives have identified Dominic Chen as an AU OPTRONICS' sales engineer who works at the 9720 Cypresswood Drive address.") The affidavit further stated that LCD-panel suppliers and LCD purchasers typically negotiate prices on a monthly basis. Sivok Aff., ¶15 ("LCD panel suppliers and larger LCD panel customers typically negotiate prices for LCD panels on a monthly basis, although they may negotiate more or less frequently depending on market conditions."). In light of this information, there was a fair probability there would be documents reflecting sales negotiations with Hewlett-Packard, and pricing instructions from AUO headquarters, at the Houston office.

The affidavit also established a fair probability that the Houston office would contain records of collusive activity between sales representatives of the manufacturers who participated in the conspiracy. According to a cooperating witness, sales representatives of the conspirators who were based in the United States communicated with each other regarding pricing. The affidavit stated that one cooperating witness had monthly conversations with sales representatives at Hitachi's Houston office, at LG Philips' San Jose office, and with Michael Wong, an AUO representative based in San Jose, California. Sivok Aff., ¶44. In fact, in an email quoted in the affidavit the witness sent his superiors pricing information provided by Michael Wong: "These items are confirmed by AUO just now. To Dell 15" - $160; 17" - $190; 19" - $305 officially offered . . ." Sivok Aff., ¶44. Given this evidence that American sales representatives at the conspiring companies, including AUO, regularly communicated pricing information with each other, there was also a "fair probability" that the Houston office would contain evidence of collusive activity.

Finally, defendants claim that the affidavit included impermissible speculation made by the cooperating witnesses. They point to three paragraphs in the affidavit that they claim demonstrate that these witnesses were merely "guessing" about what might be found at the Houston office:

> 51. . . . Based on my knowledge and experience investigating antitrust offenses as well as evidence provided by [confidential] sources, LCD panel suppliers disseminate to their sales people worldwide pricing information required to provide prices or quotes to purchasers or LCD panels. . . .
>
> . . .
>
> 54. Based on his practice and knowledge of the LCD panel industry generally, CW-2 further indicated that he expects documents reflecting the conspiratorial agreements discussed herein would be found at sales offices in the United States for each of [the] co-conspirators, including AU OPTRONICS. . . .
>
> 55. CW-2 further stated that sales and marketing offices of LCD panel suppliers would likely keep pricing and sales information on LCD panel sales for a substantial period of time. . . .

Sivok Aff., ¶¶51, 54, 55.

While the above statements are somewhat speculative, they are by no means the meat of the affidavit. To the contrary, the specific and detailed evidence referenced above made a compelling case that AUO participated in price-fixing agreements in Taiwan, that these agreements involved sales to Hewlett-Packard, and that AUO America's Houston office conducted sales negotiations with Hewlett-

7

1 Packard. While the confidential witnesses' insights may have supplemented the factual basis for the
2 search warrant, they were not necessary to the determination of probable cause.

3       The Court finds that Special Agent Sivok's affidavit established probable cause for the search
4 warrant. Accordingly, defendants' motion to suppress is DENIED.[3]

## II. Defendants' request for a hearing under *Franks v. Delaware*

      Given the Court's determination that the warrant was supported by probable cause, the defendants request a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to establish that the warrant affidavit included deliberate or reckless false statements. Because search warrants are presumed valid, a defendant is only entitled to a *Franks* hearing if he can make "substantial preliminary showing that false or misleading statements were (1) deliberately or recklessly included in an affidavit submitted in support of a search warrant; and (2) necessary to the finding of probable cause." *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) (internal quotation marks omitted). The Court finds that none of the purported misrepresentations defendants have identified justifies a *Franks* hearing.

### A. Failure to identify AUO America as a separate corporation

      First, defendants claim that the Sivok's affidavit falsely identified the Houston office of AUO America as a sales office of AUO. *See*, *e.g.*, Sivok Aff., ¶ 8 ("I make this affidavit in support of an application for a search warrant for the business offices, secretarial areas, document storage areas, computers, and electronic devices of AU OPTRONICS, which is located at 9720 Cypresswood Drive, Suite 241, Houston, Texas 77070 . . . ."). Defendants argue that publicly available information, including AUO America's website, California corporate records, and even a business card from an AUO America employee that was in the government's possession, all established that AUO America was an entirely separate company from AUO. They claim that the affidavit deliberately misrepresented the corporate structure to strengthen the connection between AUO's foreign activities and the Houston

---

[3] Given the Court's finding that the warrant was supported by probable cause, it need not address defendants' argument that there was no probable cause to search the laptop computers, cell phones, and other devices belonging to AUO America's employees. The Court also need not reach defendants' argument that the good-faith exception to the exclusionary rule does not apply to this case.

8

office.

In order for defendants to obtain a *Franks* hearing, they must establish that the purported misrepresentation was material. *Franks*, 438 U.S. at 171-72. Affirmative misrepresentations are material only if there is no probable cause absent consideration of the misrepresented facts. *Id.* A misrepresentation based on an omission is material only where the omitted facts "cast doubt on the existence of probable cause." *United States v. Garza*, 980 F.2d 546, 551 (9th Cir. 1992) (internal quotation marks omitted).

The Court finds that the information about AUO's corporate structure was not material to the magistrate's probable cause determination. To begin with, the warrant affidavit correctly identified the Houston office as the office with which Hewlett-Packard negotiated its purchases of LCD panels. Defendants do not dispute this characterization. Regardless of the precise corporate relationship between AUO and AUO America, the fact that the Houston office handled the Hewlett-Packard negotiations made it very likely that it would contain evidence of the price-fixing conspiracy, such as price sheets and sales records.

Further, aside from the technical corporate distinction between AUO and AUO America, defendants have not made any showing that there is a meaningful distinction between the two entities. To the contrary, it appears that AUO America's Houston office operated exactly as the affidavit described it – as one of AUO's many worldwide sales offices. Sivok Aff., ¶16 ("AU OPTRONICS is headquartered in Hsinchu, Taiwan, and has sales offices worldwide in China, Japan, Korea, Singapore, Europe and the United States (Houston, Texas; Cupertino, California; and Chicago, Illinois)."). In fact, AUO's own literature describes AUO America as one of AUO's "sales locations." Declaration of Paul L. Knight in Support of Motion to Suppress ("Knight Decl."), Exh. 6 at DOJ 0004742 (AUO brochure retrieved from the Houston office listing AUO America and "Other USA Sales Locations"). Not only is AUO America a wholly-owned subsidiary of AUO, but its CEO, Hui Hsiung, was Executive Vice President of the parent company and a regular attendee at Crystal meetings. Knight Decl., Exh. 8; Sivok Aff. ¶40. Further, according to documents provided by defendants, employees of AUO America – as well as AUO America itself – used email addresses belonging to AUO. *See* Knight Decl., Exhs. 5, 6 (listing email address for AUO America as "usa@auo.com"; email address for an AUO America

9

employee also used the @auo.com address).

Given this close corporate relationship, the technical corporate form of the Houston Office was not material to the magistrate judge's conclusion that evidence of the price fixing scheme was likely to exist at the Houston office.

### B. Description of Dominic Chen as a "subject" of the investigation

Defendants also claim that the affidavit falsely listed Dominic Chen as a "subject" of the DOJ's investigation. Chen was an AUO America sales representative who handled negotiations with Hewlett-Packard and who worked out of the Houston office. In the beginning of the affidavit, in a section titled "Subjects of the Investigation," the affidavit lists Chen among the seven AUO employees who were under investigation. Sivok Aff., ¶7. Defendants claim that there is no evidence in the affidavit that Chen was involved in the price fixing conspiracy, and argue that he was just named as a "subject" to manufacture probable cause to search the Houston office.

As an initial matter, defendants have not supported their claim that this statement was false with a "detailed offer of proof," as is required under *Franks*. *See United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008). Their claim that he was never a "subject" of the investigation is based upon nothing more than speculation.

In any event, the Court finds that the statement is not material. While the warrant affidavit identified Chen as a subject of the investigation, it also identified the basis for that classification – the fact that he was a sales engineer who handled sales negotiations with the Hewlett-Packard. Sivok Aff., ¶47. Given that the magistrate judge was informed of the reason Chen was named as a subject, defendant's purported misrepresentation was not material.

### C. Statements of confidential witness

Defendants also claim that two statements attributable to "CW-2," one of the government's confidential witnesses, are false. Specifically, paragraph 54 of the affidavit claims that "CW-2 indicated that he expects documents reflecting the conspiratorial agreements discussed herein would be found at sales offices in the United States for each of [the] co-conspirators, including AU Optronics." The other

1  statement reads: "CW-2 further stated that sales and marketing offices of LCD panel suppliers would
2  likely keep pricing and sales information on LCD panel sales for a substantial period of time." Sivok
3  Aff., ¶55.

4  Defendants have not made an adequate showing that these statements are false. They have
5  shown only that the statements are not included in the summary of the confidential witness's initial
6  interview with the DOJ. According to the government, the confidential witness made these statements
7  in response to specific questions that were given to him after that interview was concluded. *See* Scott
8  Decl., ¶5.

### D. Experience of Agent Sivok

Finally, defendants claim that Agent Sivok misrepresented her own experience in the search warrant affidavit. They claim that her statement in paragraph 51 of her affidavit that she has "experience investigating antitrust investigations" contradicts her description of her background in paragraph 1 of the affidavit, which does not specifically include antitrust investigations.

The Court finds that Sivok's cursory reference to her "experience investigating antitrust offenses" is not material, nor is it contradicted by her statements in paragraph 1, which state that she has experience investigating "anti-competitive conduct." In any event, defendants have provided no evidence that her statement was actually a misrepresentation, and Sivok has included a supplemental declaration detailing her "experience investigating antitrust offenses." Declaration of Susan K. Sivok in Support of United States' Opposition to Motion to Suppress, ¶¶ 4-5. The Court therefore finds that there was no misrepresentation.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court DENIES defendants' motion to suppress and DENIES their request for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).

**IT IS SO ORDERED.**

Dated: May 24, 20011

SUSAN ILLSTON
United States District Judge

11